You can see three of us up here, I imagine. Yes. And you did have a practice just a while ago where Judge Jones can hear. Fine. Okay. Well, as you I'm sure understand, we only have the one case today. I appreciate your flexibility in helping us, flexibility in helping us schedule this. Judge Jones, are you hearing me and presumably Steve when he speaks up? All right. Don't know about Steve, but I can hear you. Well, Steve speaks more loudly. I'm sure. Hello, Edith. You'll hear him. Uh, well, we'll start then with Miss Carol. Good afternoon, Your Honors. Judge Jones. May it please the court. I'm Catherine Carroll on behalf of the appellant, Andre Thomas, and I've asked to reserve five minutes for rebuttal. Your Honors, Mr. Thomas's trial counsel were constitutionally ineffective from start to finish of his capital trial, and we've, the court granted a COA on four related issues. First, at the outset of trial, counsel took no action when three jurors openly admitted racial bias during voir dire. Counsel failed to prevent those jurors from being seated or even to inquire into two of those jurors bias. You said no action. We do have the written questions given to all, the venari, I suppose, or I'm not sure when they were given. You can tell me that. That is at least some action, is it not? And when we're evaluating the previous review of that, we'll have to factor that in. So it was the jurors' responses to those questions, which were in the questionnaire that was given to all members of the veneer. The jurors wrote their responses to that questionnaire, and it was in their responses to that questionnaire that three jurors openly admitted what the director concedes is at least some degree of racial bias. And as to two of those jurors, counsel asked no questions whatsoever, did nothing, didn't challenge for cause, didn't use a peremptory, didn't say a word about it. As to a third juror, counsel did ask limited questions, essentially giving the juror an opportunity to insist that, that he was not racially biased. But as to the... See the one in the written interrogatories who said he had religious reasons? No. So there was one of the jurors, and I think maybe the one you're thinking of, Your Honor, it was Juror Copeland, who was the one who said his church's position on interracial marriage is that it should not be, and that he agreed with that, because in his words, and these are voluntary words that the jurors could write in blanks in the questionnaire, that is not the one that they questioned. The one that they questioned was the one who checked the box stating that he was vigorously opposed to interracial relationships and not afraid to say so, and he went on to explain in his own words that he didn't believe God intended for it. But then the other jurors, one expressed that it was his church's position, and he thought it was important for people to stay with their bloodlines. The other juror, who also wasn't questioned, indicated that she felt it was harmful to children because it's important to have what she called a specific race to belong to. So there's no doubt that, as the director concedes, there's an expression of racial bias here, and it is clearly established federal law under the Supreme Court's decisions, as this court recognized already in Virgil, that a defendant has a right to be tried by an impartial jury, and that the presence of even one biased juror is structural error that requires reversal without even regard to any prejudice. Among those cases, Turner, and I am loath to talk about any of these, I expect you know them much better than I do, but let me quote from there, a capital defendant accused of interracial crime is entitled to have prospective jurors informed of the race and questioned on the issue of bias, and then explains why that's minimally intrusive. It seems to me that when the state court has already looked at this question, under epidefrance, we have to consider that first. It seems to me we have some questioning of the jurors here, though only through the written interrogatories or jury questionnaire. We have the one of the three jurors who, perhaps within the range of competence these lawyers decided was the most in need of being questioned further, and so the issue wasn't ignored, and I'm not sure we can say that Turner has not, but you need to tell me why all that means that Turner has not been complied with. So a couple of responses to that. First of all, the state court applied a rule that's contrary to clearly established law by requiring a showing of prejudice. As we explain in our brief, that's contrary to what the Supreme Court has held, and so it's not entitled to deference. The state court didn't conclude that counsel had discharged their duties in response to the expressions of bias. That's even if you grant that— What do you mean? They didn't analyze it thoroughly enough? I'm not sure they even cited Turner. I don't know what they cited. No, that's correct, and I want to focus— And it seems to me the thoroughness and articulateness of lower court's opinions and this Court's opinions is not always a way to tell whether there's been a thorough consideration of it. So what's your primary objection to how—or what are your objections to how the state court handled this? As in Virgil—and Virgil was also an EDPA case in which the court had found the state court had rejected the claim—as in Virgil, the state court's application—if we're shifting into the ineffectiveness claim, and I want to make clear we've raised this as both an ineffectiveness claim and a straight-up jury bias claim. On the jury bias claim, the state court specifically recited a rule of law that conflicts with what the Supreme Court has said is the governing law. With respect to the ineffectiveness claim, the state court simply says that Mr. Thomas failed to demonstrate deficiency or prejudice, and as in Virgil, we believe that was an unreasonable application of Strickland for several reasons. First of all, again focusing on the two jurors that counsel never questioned. Your Honor points out that they were questioned in the sense that they had to fill out the questionnaire, but that is precisely what exposed the problem. It was in answers to that questionnaire that the jurors admitted in their own words that they harbored racial bias and a bias that aligned directly with the facts of this case. Essentially what these jurors were saying is, I harbor moral disapproval of people like this defendant who engage in these kinds of interracial relationships because, in my view, it violates God's intent, it taints bloodlines, it harms children. As to those responses, just like in Virgil where the jurors during voir dire gave some indication, I think there there was in one case it was a relationship with somebody in the police department, for example, and what the court focused in on in Virgil was then, quote, a total lack of response in the face of that expression of bias by the jurors. And that is the problem here, that everybody had to fill out this questionnaire, these three jurors gave these responses that indicated bias, and then counsel sat there and did absolutely nothing about it with respect to two of them, allowing them to be seated without even asking any questions. What we know in the record from the counsel is that they felt it was strategic? The second affidavit says that. The lawyer's first affidavit says it wasn't strategic, I just didn't do it. The second affidavit says, oh, I would never ask questions about race because that could be sensitive or even offensive to some jurors. And I guess, Your Honor, here's how I would think about this. Take it out of the race context for a minute. Suppose you're representing a defendant who's visibly covered in tattoos. And a juror announces during voir dire, I morally disapprove of people who tattoo their bodies because I believe that is contrary to God's intent and harmful, et cetera, et cetera. I don't think anybody would dispute that counsel can't just sit there and ignore that. And when you put that in the racial context, what the Supreme Court has told us repeatedly in Georgia versus McCollum and then more recently in Pena-Rodriguez and Buck, when the bias at issue is race, that is not the time to get squeamish and not ask questions. That is the time when it is especially important, as the Supreme Court put it in McCollum, to rid the jury of prospective jurors where there's specific reason to believe that they might not be capable of confronting and suppressing their racism. And so the need for counsel to do something about it was at its zenith here. This was not the time to be squeamish. And in any event, the racial dynamics of the case had already been injected because the questions were there in the questionnaire, laying out the interracial facts of the case and inviting the jurors to think about it. There wouldn't have been anything offensive about counsel saying, you know, this is a sensitive issue, and we're all entitled to our opinions, and I certainly respect yours. I wonder if you could tell me a little bit more about it. What year was Turner decided? The real question is, what's the circuit you would point to as the best application of Turner in a Strickland context? You know, race inextricably tied up with the crime, jurors in some context admitting to racial animus. So my best case on counsel's obligation to probe is Virgil, which did not involve racial bias. It involved other forms of bias. But the Supreme Court has clearly articulated that bias can come from a lot of different things. Another thing that's important about the Supreme Court's cases is that they've made clear in Ham and in Morgan that generic assurances of fairness cannot suffice when there's some other reason to suspect that there is some bias going on that the juror hasn't been made to confront. And that's also part of what the court highlighted in Virgil, was that the prejudice – I mean, the court recognized that since this is structural error, that also perforce establishes Strickland prejudice. But the court also emphasized that – If we don't conclude structural error perforce establishes prejudice under Strickland, do you lose? No, because as the court in Virgil went on to explain, there's a few other things going on under the prejudice bucket. One is the prejudice that arises, as this court put it, as much from the unknown as from the known. Because of the total failure to question, we don't know the full depth and intensity of the bias, and we don't have any reason to suspect that these jurors would have been able to set it aside. And so that was a problem the court pointed to. Again, I would also point to the interracial facts of the case, and frankly, the racial – Excuse me. I'm sorry, Judge Jones? Sorry, I just have one question. You say the problem arises from what we don't know, but wasn't it your obligation to demonstrate what we should know? Certainly we think we know plenty from the questionnaire itself, and to the extent – part of why we've teed this up additionally as an ineffective assistance claim, just as in Virgil, is because counsel had an obligation to make some inquiry once the jurors expressed that bias. Ms. Carroll, Virgil is not clearly established law of the Supreme Court. Of course. I'm sorry. Virgil itself relies on Supreme Court precedent. Virgil surveys the Supreme Court case law, and Virgil holds that it is in fact clearly established under Supreme Court precedent that the propositions we are relying on are true. And it's worth bearing in mind, I think, just the sort of broader racial dynamic of this case, given the facts, given – you know, I mean, the whole voir dire was premised on – was sort of started off with the jury shuffle to eliminate all but two African Americans from the entire jury – potential jury pool. You ended up with an all-white jury. There's evidence throughout the case about Mr. Thomas's relationships with white women. And the prosecutor's very last words to the jury before they retired to deliberate at the penalty phase was a comment along the lines that, you know, if Mr. Thomas is not put to death, potentially he's paroled someday, and then potentially he could date your daughters. This was a palpable dynamic throughout the whole case. And going back to Turner or Judge Southwick, one thing the court emphasizes there is not just the general odiousness of racial bias, but its unique potential to taint jurors' deliberations at the penalty stage, where the jury is called on to make an overall comprehensive evaluation of the defendant's humanity and moral culpability, that that is precisely the time when racial bias can do its worst. And so for those reasons, we think it was clearly – the onus was clearly on counsel to do something about this. And for at least two of those jurors, they sat there and did nothing. And unless the court has further questions about that issue, I think that is a good sort of segue into the other issues that we've raised here, which also go to counsel's fairly patent deficiencies throughout the rest of the trial, and in particular, deficiency in their handling of what was indisputably the number one most important issue at this capital trial, which was understanding, investigating, and helping the jury to understand the nature and causes of Mr. Thomas' profound mental illness. That failure was vividly on display at at least three crucial junctures of the case. First, when they, quote, didn't think about raising competency when he was returned from the Vernon Hospital and before he was arraigned. Second, in their failure to develop and present an appropriate expert presentation that would help the jury to understand that this was a person who had suffered for many, many years from the symptoms of mental illness and psychotic disorder, not someone who had sort of drunk himself into his problems and taken DXM to sort of bring on all of his own woes. And third, in their failure to develop and present any kind of appropriate mitigation case. The mitigation case that this jury heard was not simply truncated or they only saw a portion of the truth. The jury was affirmatively misled by an inaccurate depiction of who Mr. Thomas was as a person and the nature of his illness. And the investigation that was performed at the habeas stage reveals that this is not a person who, as both states' experts and the defense expert, told the jury, this is someone who hasn't had any symptoms of mental illness at all before January 2004, except for one strange dream in 2001 or 2002. If we're trying, you have limited time and these are three. Yes, I'm trying to. Strickland, yeah. For just my own benefit, and I know you'll disagree and we have your brief, the competency issue after the clinical evaluation suggesting exaggeration and malingering is a little harder. And sentencing mitigation, we see that a lot and the state high court did say the mitigation was offered and arguably there'd be a strategic reason not. The issue of the three that concerns me most is the trial. And so with attention to that, if you don't mind, was there some effort to say this is organic and it wasn't a self-intoxication? And how does that fall short under clearly established Supreme Court law? So it's clearly established that counsel has a duty to conduct a reasonable investigation into potential defenses, including where necessary, finding appropriate experts. This court in the Drowen case that we cite granted relief under AEDPA for a failure to perform exactly that. That's your best and closest case for the issue I'm focused on. I believe that's, I believe that's so. I think with respect to counsel's mishandling of that issue, I think it's actually helpful to put it into a chronology of how their investigation into experts or lack thereof unfolded prior to trial and then during the trial. So we know from Mr. Haygood's comments at trial that he understood that the quote real fight in the case was did Mr. Thomas suffer the undisputed psychosis because he had been suffering from schizophrenia untreated for much of his life? Or had he sort of drunk himself into it by taking this cough medicine three times in the months preceding the crime? So we know that counsel understood that this was pivotal. We know that counsel engaged in the fall of 2004, a couple months before trial, the psychiatrist who testified, Dr. Grippen. But we know from both from the attorney's affidavit at ROA 492 and from Dr. Grippen's affidavit at ROA 439 to 440 that counsel knew that substance-induced psychosis was not Dr. Grippen's area of expertise. And he therefore did not intend to rely on Dr. Grippen for that purpose. We also know, fast-forwarding to voir dire in January of 2005, that Mr. Haygood and the prosecutor, Mr. Ashmore, sat down together during voir dire to go over who the state's experts would be. And it was in that conversation, reflected at page 2326 of the state habeas clerks record, in which the prosecutor told counsel that one of the experts they had initially disclosed, they wouldn't be using him. And one of the things that the prosecutor flagged was, you know, when we had our conversation with this expert, he had raised questions about whether taking DXM at these dosages would ever be able to produce the kinds of psychotic behaviors that Mr. Thomas engaged in. And, in fact, Dr. Miller's CV, which would have been available at the time, revealed that he had a fairly plentiful body of scholarship on that issue. So that's at voir dire. We then go forward into trial. On February 21, the prosecution calls its expert psychiatrist, Dr. Scarano, who testifies for the prosecution that, in my opinion, you know, based in part on the fact that, as far as I know, Andre Thomas has not suffered any mental illness problems until January of 2004, which the defense does not challenge at all, because they haven't looked into Mr. Thomas' background at all at this point. Dr. Scarano testifies that, I think this was all substance-induced. We then see e-mails, and these are in the record at ROA 1180 and ROA 1182, in which Defense Counsel Bobby Peterson sends an e-mail that night and says, Scarano has testified. We need someone who can testify about this DXM. This is the middle of trial, and counsel is expressing, uh-oh, we need someone who can testify about what we all understand is the number one dispositive issue at the guilt phase. A couple days later, on February 23, the mitigation specialist writes back with the name and number of a psychiatrist who has come highly recommended from someone that she was consulting to try to find an expert. Around the same time, Ms. Peterson has also reached out to Dr. Harrison, who was the psychologist who had evaluated Mr. Thomas for competency the prior spring. And Dr. Harrison said, you really need to get someone else. I don't have the kinds of credentials to be able to testify on this issue. She said, we're out of time. And this is at ROA 503. We've run out of time. We need you to come on and at least testify about this, even though Dr. Harrison was never even asked to opine on insanity. And he expresses, both at trial, in front of the jury, and later in his affidavit, that counsel had simply not even given him an opportunity to evaluate, to review the records, to conduct the kind of evaluation of Mr. Thomas that would be necessary. So through that whole time, the evidence in the trial record makes, I think, unmistakably clear that on the central issue in the case, that counsel knows is the central issue, they have utterly dropped the ball in preparing to find an appropriate expert to testify. They end up relying. Ms. Harrell, excuse me. But the state, at page 32 of their brief, quotes Dr. Griffin as saying absolutely and unequivocally that Thomas was operating under the effect of psychotic illness, specifically schizophrenia. That's correct. And I would direct the court's attention to Dr. Griffin's testimony in full at pages 91 to 92 of volume 36 of the reporter's record, which is the two pages, only two pages, that counsel gets Dr. Griffin to explain why he has ruled out substance-induced psychosis. It is as minimal as it could be compared to what counsel then does by turning around to calling the prosecution's experts and giving them free reign to explicate their contrary positions. Ms. Harrell? And Haygood explains— Stop, please. I'm sorry. Judge Jones, I thought you were continuing your question, were you? Oh, I'm sorry. I didn't— I forgot while she was going on. I'm sorry. I'm so sorry, Your Honor. I didn't hear if there was a follow-up. What happened in the closing argument? Do we see that the defense attorney was handicapped, or does he almost say, how could you conclude anything other than psychosis from a man who commits a crime this way? He did, but noticeably in closing, the prosecutor at 37, reporter's record 22, specifically calls out that the defense's experts, they don't have the necessary experience with DXM. So they're impeached both during their testimony and in closing by the prosecutor for not being the appropriate experts. And Haygood himself attests in his affidavit that because he knew that Dr. Grippen, this wasn't really his area, he hadn't prepared Dr. Grippen on it, and he didn't even tell Dr. Grippen until right before they called him, scrambling because, uh-oh, we need to get someone on this DXM thing. He attests in his affidavit after the fact that I had to hold back. There were questions that I would have asked someone had I had the right person, and I didn't because I knew that Dr. Grippen couldn't really answer them. And that, I think, is borne out in the extremely paltry trial transcript on this issue. The state court in—I'm sorry. I have a factual question. Was the jury aware that Mr. Thomas had gouged his eye out while he was in jail? They certainly would have been able to see that he was bandaged, or I think he might have had an eye patch on at that time. So whether—and I know during voir dire, it is expressed, you know, this is a very grave event that has happened in a small town, and many of the veneer members express, you know, we've read all about, oh, this is the guy who pulled his eye out. In fact, one of the biased jurors, Juror Armstrong, whom counsel allowed to be seated, one of the other things she said at voir dire was that she didn't wonder if maybe he hadn't done that to make people think that he wasn't in his right mind. Counsel said nothing. But back on the experts issue, I just want to—oh, I'm sorry. You'll have time for rebuttal. Okay. Thank you. May it please the Court. Matthew Frederick for the Director. Thomas cannot set aside the relitigation bar under AEDPA for any of his claims, and with respect to his claim related to juror bias, he can't set aside the relitigation bar on either of his claims because no Supreme Court holding clearly establishes that a juror's expression of bias alone, whether it's bias against tattoos, drug use, or even interracial marriage, creates an incurable inference that that juror cannot be impartial. So I want to focus on those claims first. He has two, as he mentioned, the straight-ahead juror bias claim and the ineffective assistance claim. Now, on the juror bias claim, we've noted in our brief that that was procedurally defaulted. I think it's not necessary, however, for the Court to resolve this on procedural default because even if it were properly presented, the state court resolved it in the alternative on the merits, and that resolution was not contrary to clearly established law. Mr. Thomas relies on Virgil. Let me ask you before you get into what the other side says, look for the exact language in the order now. You're talking about a ruling by the State District Court that then gets adopted by the higher court when it adopts all the findings of fact. Is that where the statement is? What is the exact statement that you're relying on? There are two statements on the failure to make a contemporaneous objection. ROA 2121 is the finding of fact, and ROA 2159 is the conclusion of law. And so as we've explained in the brief, this court does not impose a strict waiver rule. Rather, it says that you can't inadvertently or carelessly forfeit a procedural default, and that makes sense because it mirrors 2254b-3's provision about waiver of an exhaustion defense. This is an analog in the realm of court-created procedural default doctrine to EDPA's specific statutory rule that mere failure to raise doesn't establish a waiver. But going back to the merits of the claim, setting procedural default aside, Mr. Thomas relies on Virgil, and Virgil does point to clearly established law, but it falls short in this case because the clearly established law Virgil points to is not broad enough to cover the circumstances here. What Virgil refers to are cases like Toomey v. Ohio, where the judge had a financial interest, and cases like Ross v. Oklahoma, where you have jurors who say, I cannot be fair and impartial. And so there is an unequivocal statement by a juror or an unequivocal basis for a reason like a financial interest to conclude that either the judge or the juror cannot be impartial no matter what they say, and that's exactly what happened in Virgil. There the court found that the jurors could sit as impartial jurors even though they had said, no, I cannot be fair. And that's not what we have here, and this is, I think, the critical point for their clearly established law argument, is that there is a gap in the clearly established law between a mere expression of bias, even an expression of bias as problematic as racial bias. There's a gap between that and establishing that you have denied someone the right to an impartial decision maker. And so that leaves room for what happened here. If counsel follows up and the juror says, yes, I can set aside my opinions, and I can give a fair verdict based on the evidence in the case, it is not clearly established that that's not enough. But even if we accept that argument, that only Ulmer was the one that was brought back to it, correct? The other two never came back to the issue. Well, not quite. Ulmer is the only one who was specifically questioned about his statement of racial bias. No doubt about that. But the other two who had said they weren't vigorously opposed, they checked the second box, they were not specifically questioned about interracial marriage, but they did say in Vordaer, yes, I can set aside my opinions, I can render a verdict based on the facts and the law. And so it's not clearly established that that necessarily deprives a person of an impartial jury, and I think that's really the gap here. That also covers the struggle. Let me ask you, what about Turner? It is an older case, 1986. Is what you're saying really consistent with Turner, or how much of this is an ETCA problem? It does seem to me to be a straight-up application of Turner. This was not a satisfactory set of questions consistent with what Turner is talking about, which doesn't mean it's reversible and structural error and whatever else, but just answer it on those terms. How is this consistent? Our argument, my best response on that is that ETCA is doing a lot of work here. Well, it needs to, and it does it, and it's there, and I'm not asking you to ignore it other than for your answer. Is what happened here really consistent in the questions and how the questions were posed? Is that really consistent with Turner? I think it is because what we have is a clear statement by these jurors on the records that I can be fair, and there is no evidence that would require the state court to find under clearly established law that that's not enough. I think that's really the key. You keep flying in there, but I guess I can't keep you from it. But what I'm asking you is, listening to this, we hold that a capital defendant accused of interracial crime is entitled to have prospective jurors inform the rest of the victim and question on the issue of racial bias. Only one of the three were questioned orally. The others had it. You know what the facts are. It just seems inconsistent, but we're several steps removed from whether that's been complied with. If you don't have another answer, you can just move on, but that does concern me. I do, and I didn't mean to avoid the question. So I think the distinction that we have here is what Turner is talking about, similar to what the court talked about in Ham versus South Carolina, which was a case where the defendant said, I want to question the jurors about race, and the judge said, no, I won't do it. And so the entitlement to ask, that's not the denial of that right is not really what's at issue here, because he did ask. The jurors were asked about racial bias against interracial marriage, at least, on the form, and so there was nothing that prevented the petitioner or his counsel from asking. This really, that's why it comes in, that aspect of their claim comes in through the ineffective assistance claim, because there's nothing external to the defense that prevented questions about opposition to interracial marriage being asked. And so when you look at it under ineffective assistance of counsel, it fails on the prejudice prong, because the argument that I understand the petitioner to make is, well, this is a structural error, and so we presume prejudice. I think that's wrong on both counts. It's not clearly established that mere bias is structural error, but beyond that, even if it were structural error, it was certainly not clearly established in 2009 that structural error requires a presumption of prejudice in a Strickland claim. In fact, in 2017, the Supreme Court in Weaver v. Massachusetts said, we will not presume prejudice when a structural error claim is not brought directly, but is brought in the context of an ineffective assistance claim. And so you can't say that there was a clearly established requirement to presume prejudice. If I could step back to kind of close the loop on the straight juror bias claim. But at oral argument, she was explaining she isn't depending on that structural prejudice point. Well, then if that's the case, then she can't possibly prove prejudice, because if there is a prejudice requirement, there's nothing here that indicates that any of these jurors' verdict was influenced by their opposition to interracial marriage. And so the state court hasn't expressed factual finding that there was no influence on the verdict. And so if there is no other evidence to rebut that factual finding, then I think that's the end of the claim, if it's not structural error, which it's not. And to be clear, there's a specific reason why it's not structural error, beyond the fact that Virgil doesn't cover it, this particular circumstance. In recent cases, Tharp v. Sellers and Peña Rodriguez, the Supreme Court has considered extremely pointed and hostile statements of race-based prejudice against the defendant. And even in those cases, in Tharp, the court was very clear that you have to have a showing of some prejudice. There was a factual finding by the state court in that state that the defendant's race didn't affect this juror's vote. And the Supreme Court didn't deny that that was relevant. So if it had been clearly established that any expression of bias alone is enough to establish structural error and require a reversal, the court couldn't have had those discussions in Tharp or in Peña Rodriguez. And to be very clear, this is a question about what was clearly established. It is not my position or the position of my office that we should encourage people who oppose interracial marriage to sit on juries in cases like this. Our position is he just can't overcome AEDPA's relitigation bar here on any of the claims he's brought. If I may, I'll move to the competency-based claim which was rejected by the state court on both prongs of Strickland. On the performance aspect of this claim, it's undeniable that Mr. Thomas, he was agreed by both sides that he might not be competent, so let's have him examined. He was examined, determined to be incompetent. And then he was examined again some weeks later and determined to be competent. Now, their claim is that at that point, counsel had an obligation to object to his competence again. But the problem, even on the effective performance prong of that, is that there was no additional information. This is unlike the cases that they talk about at their brief, their opening brief at page 43, and also in their reply brief, cases like DROPE, where there is later information or a new development that creates a new obligation to investigate competency. And so that could be something like a later suicide attempt, or in one of their cases the defendant made an unreasonable decision to all of a sudden change his plea to guilty. And so the courts have said, well, once you get that new information that creates a new reason to inquire, then, yes, you need to inquire. But here there isn't any such new information. And I think their response is, well, yes, but you have to look at the record that would have been created. And that's fair enough, but the standard for a failure-to-investigate claim is you have to allege with specificity what the investigation would have uncovered and how it would have changed the outcome. The two competency examinations conducted by the same person, same process, and then the fact found incompetent a few weeks later, found competent, some question about the validity of the second one. Was it done by the same person, the examination, same doctor? As I understand, there were two experts that did the competency evaluation. And my recollection of the record is that there – I think I may have misspoke. I don't believe that there was an actual investigation and determination that he was incompetent. I think it was more of an agreement that we need to have him investigated. Well, when he went to the Vernon Hospital, wasn't a big reason for that to medicate him, to give him antipsychotic medication, which is what is very common for schizophrenia? Yes, that's absolutely right. After the determination – And so how can we say that his counsel was incompetent for not raising this issue again because presumably when he came back to Vernon, he was in circumstances, I hope the record shows this, where he was continuing his medication, and counsel says he was able to assist in his defense. That's absolutely right, Judge Jones, and I don't think we can say that counsel was ineffective because there wasn't any – the state of affairs once he came back and was on the medication, which the record indicates did continue through trial, was that he was competent at that point and there was nothing that would trigger any additional duty to investigate. And this is a problem on the prejudice prong too because they don't say, well, if you had investigated, here's what you have found. The only evidence that they offer is a handful of statements by members of the defense team, which they were there, but so was the trial judge who made the finding in state habeas, and so was the other defense counsel who said he was competent. And on top of that, you have Dr. Griffin saying that he was competent. So I think they just can't prove that the state court's application of Strickland was unreasonable in those circumstances. On the expert testimony-based ineffective assistance claim, I think to understand how this fits in, it's important to frame it and remember that there are basically two ways that his insanity defense could have failed. One is a showing of voluntary intoxication. That's a rebuttal. Even if he establishes that he had a severe mental disease or defect, that meant he could not understand that his conduct was wrongful. But the other way it could fail is if he doesn't prove that he didn't know his conduct was wrongful. And so as I read their arguments in their new evidence, it's limited to the voluntary intoxication issue, but we are still left, even after that, we are still left with substantial evidence produced at trial that Mr. Thomas did know that his conduct was wrongful at the time. And so once we get to prejudice on this claim, even if he can show that, well, you should have brought in all this other voluntary intoxication evidence, we've still got this independent barrier. But to focus on their argument, one of their arguments is that the defense was ineffective for failing to hire a neuropharmacologist. One issue with that claim is that the prosecution didn't have a neuropharmacologist here either. This is at ROA 2115 and 2138. The two main experts that the prosecution offered, they were psychiatrists, just like Dr. Grippen. But when we look at what Dr. Lipman has offered, the question is, what is it that he's offering that wasn't offered before? And for the most part, his opinion is very similar to Dr. Grippen's. He says, no, I don't think this was substance-induced. I think this was all organic. Now, he does say, he talks about the neurotoxicity of DXM and says, I don't think these symptoms are consistent with that. But that aspect of his testimony isn't new, but I don't think it is responsive to the state's theory because that seems to be directed at an argument the state didn't make, which is that this is what happens when you're high on DXM. And that wasn't the state's theory. The state's theory was his use of DXM in combination with other substances interacted with his preexisting condition to create a psychosis that would not otherwise have been there. And so you can certainly see how that could make sense as a factual matter because there was testimony that he had a preexisting condition even before he used quercetin. Even the prosecution's experts admitted that he had deja vu, heard voices, had hallucinations. He dunked himself in holy water and was suicidal. This is Dr. Axelrad, 34, reporter's record at 75 and 106. This all happened before quercetin. And so it's not unreasonable to think the jury might look at that and say, well, yes, he did have this condition, but he wasn't being violent until you put quercetin in the mix. And so I think the end result of all this is there's a statement by the state court that Littman's new testimony doesn't show that the prosecution's experts were wrong. And I think Mr. Thomas has kind of focused on that and said, well, that's not the right standard. It's not the right standard, but that's not what the state court is saying. What the state court is saying is it doesn't so undermine the prosecution's theory that nobody could possibly believe it. In essence, this is still a battle of experts. Now he would have one more, but the state still has two who disagree. And so I think that is fatal to his attempt to prove prejudice here based on the presentation of expert testimony. And then if I could move finally to the Wiggins claim. Again, this was rejected on both prongs of Strickland by the state court. And on deficient performance, it is true that defense counsel did not interview every family member. They have introduced a number of affidavits from family and extended family. But I think we have to consider that, one, Mr. Thomas' mother would not cooperate with the defense. She would not talk to the mitigation expert. And then when we look at what case was put on, they did put on Dr. Allen, and she testified about his family history, about his background. And she said, this is 41 reporters' record at 70 to 71. I think mental illness was the driving force. If he had received proper treatment, I do not think we would be here today. And so ultimately if you look at the mitigation case that was put on, even accepting criticisms of counsel's investigation, the case they put on doesn't leave out any area that Thomas now says should have been examined. One instance of that is Mr. O'Bannon, Brent O'Bannon at the guilt phase, he testified that he had evaluated Mr. Thomas when Thomas was 16, and he at that point diagnosed him with psychotic disorder, noted that he had hallucinations, heard voices, and he concluded that Mr. Thomas at 16 really needed help. And so the jury heard that. The final point is on the question of prejudice, I think we actually have evidence that the alleged failure to produce an adequate mitigation case did not prejudice Mr. Thomas here because there's testimony from the jury foreman to the effect that once the jury saw photographs and the crime scene video, it had made up its mind essentially not only to convict, but that this was a case deserving of a death penalty. So if there are no further questions, we respectfully ask the Court to affirm. All right. Your Honors, there's a lot of issues in this case, and I'm going to try as much as I can in the next five minutes to answer a few arguments on each of the four issues. I have a briefing in this case, too. Your briefing is there as well. Well, there were a couple of points that I think it's important to make sure the record is clear on. I think beginning maybe with the juror bias point, my colleague points out that these jurors gave generic assurances of fairness, but it's important to understand the context of those assurances. Those were each responses to questions about very specific other biases. Juror Armstrong had mentioned that she was really bothered by cases where there was harm to, I think in her words, precious children and grandchildren, and counsel followed up to ask, notwithstanding that concern, can you be fair? So she was questioned, can you set that bias aside, not her racial bias? Similarly with Juror Copeland, he made a comment about having, I believe it was that he had read a lot about the case in the news. He was asked, can you set that aside and be fair, and he said yes. It was not can you set aside your racial bias, and the Supreme Court in the Ham case was a case where the jurors were specifically asked in a general, generic way, can you be fair, can you be impartial, can you decide according to the law and the evidence, and they all said yes, yes, yes, I can be fair, and the Supreme Court said that is not good enough. Even on the facts of that case where the jurors hadn't said anything to suggest that they might be harboring some racial bias. This case is a fortiori from that and from Turner, as your Honor has pointed out. So those generic assurances are not sufficient. Pena-Rodriguez and Tharp are dealing with a separate issue where you're trying to impeach a verdict after the fact by some later discovered evidence. This is a case where the bias came out right there in the middle of voir dire for everyone to see and counsel did nothing. With respect to the experts issue, I think one thing to just bear in mind, you know, I think my colleague was correct to point to the state court's reliance on what I think my colleague agrees is not the correct legal standard, which is that the state court said that the claim failed because Mr. Thomas had not shown that the affidavits and reports of Drs. Lipman, Young, and Gurr didn't prove that the state's experts' opinions were erroneous. That is not the standard. The standard under Strickland is just is there a reasonable probability enough to undermine confidence in the outcome? And when you have state experts coming up, testifying on an unchallenged predicate that there had been no mental illness prior to January 2004, testifying that this is substance-induced, and when counsel has failed to find an appropriate, this isn't about you specifically had to have a neuropharmacologist. This is about counsel's duty to have a reasonable investigation into defenses and to prepare a reasonable response. As this court put it in Drowan, when counsel's failure to put on an appropriate expert case leaves a central predicate of the state's case unchallenged, that is unreasonable, and the state court's contrary application of Strickland in that case was also unreasonable under EDFA. Ms. Carroll? Yes. Mr. Frederick also pointed out that Thomas would lose on his insanity defense if the jury concluded that he did in fact know the difference between right and wrong. Yes. And what do you say about that? So what I would say about that with respect to my colleague is that it simply cannot be separated from the issue of the cause of Mr. Thomas' psychosis. The particular actions and statements of Mr. Thomas' – I'm sorry? Well, is that argued in your brief? I mean, it seems to me that when he goes and confesses just a few days later and turns himself in, that does indicate a knowledge of right and wrong. Your Honor, he confessed that very day, and he was saying things along the lines about how he was very focused on forgiveness, and these are comments that can't be understood and interpreted apart from his psychosis. Everybody agrees that one manifestation of Mr. Thomas' psychosis was a fixed delusional system in which he believed that by carrying out these crimes in the ritualistic fashion that he carried them out, he was carrying out God's intent, and he believed that he would be forgiven because he believed he had saved the world by doing this. So these are the kinds of things that the State was pointing to to suggest that he knew right from wrong. These were simply manifestations of his delusion, and so the juror's interpretation of that evidence again goes back to how do I as a juror evaluate the fact that Mr. Thomas was conceitedly psychotic when he did this? Do I have to ignore that because I think he drank himself into it and took cough medicine, or do I have to give that some effect? And when you have counsel having failed to even understand and investigate the full background, telling the jury through their fact witnesses and through their own expert that Mr. Thomas really hadn't had any mental illness problem prior to the months before the crime, it's true that the jury heard all kinds of evidence about Mr. Thomas' strange behaviors in the months immediately before the crime, and this gets a little bit into the mitigation piece as well. That was affirmatively misleading to the jury because the jury heard family members, his father and his brothers and his aunt, saying, oh, Andre never really had problems before. You know, Andre's brother is schizophrenic, but Andre, we never had those kinds of problems with Andre. That is simply not accurate, and had counsel, I mean, even talked to Mr. Thomas' father before he showed up to testify, which Mr. Haygood didn't, had they gone to talk to the other family members like childhood friend Christopher Bennett, who could have told the jury about a boy of nine or ten years old who was already at that time hearing the voices of demons and talking to them right in front of his friends without, as if they weren't even there. That is the presentation that the jury didn't hear. I imagine you can talk about this case for a good while. I'll give you 30 seconds to wrap up. Thank you. I mean, I think, as is clear, I think the one thing that I would take away from this case is how the deficiencies on each of these issues inform all of the others. The failure of counsel to do anything at all, to talk to Andre's family members and friends, to understand who he was, informs their reaction when a doctor comes back from Vernon saying, contrary to what the experts said a month ago, we think he's competent. When the experts stood up and said, we think this is drug-induced. And when, at the penalty phase, the prosecution said, this is just a juvenile delinquent who doesn't really have any sort of redeeming moral humanity to him. It's that failure to really grapple with who Andre Thomas was and with the nature and cause of his profound illness that informs all of these errors, including allowing him to be tried by a jury who, according to this court in Virgil, it is clearly established that biased jury is structural error and results in a jury that cannot render a constitutional verdict. All right, counsel. We thank both of you for your very informative arguments today. We are adjourned.